VECTRA FITNESS, INC., a
Washington corporation,
Plaintiff,

v.

ICON HEALTH & FITNESS, INC., a Delaware corporation; and Sears Roebuck and Company, a New York corporation Defendants.

Icon Health & Fitness, Inc., a
Delaware corporation,
Counterclaimant,

v.

Vectra Fitness, Inc., a Washington corporation, Counterclaim Defendant.

No. C02–635R.

United States District Court,
W.D. Washington.

Aug. 27, 2003.

See also 272 F.Supp.2d 1164.

**1158**

L David Griffin, Larry R Laycock, William R. Richter, Charles L. Roberts, L. Rex Sears, C.J. Veverka, David R. Wright, Workman Nydegger & Seeley, Salt Lake City, Gillis E Reavis, Stephen Tan, Brown Reavis & Manning PLLC, Seattle, WA, for Icon Health & Fitness Inc, Sears Roebuck & Co, Defendants.

Paul T Meiklejohn, Brian Chung Park, Dorsey & Whitney LLP, Seattle, WA, Jose Luis Sanchez, Vectra Fitness Inc, Kent, WA, for Vectra Fitness Inc, Plaintiff.

ORDER DENYING DEFENDANTS' MOTION FOR A FINAL JUDGMENT; GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON IN VALIDITY DEFENSES; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON EQUITABLE DEFENSES; AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO LOST PROFITS

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on four motions: (1) the motion for entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b) by defendants ICON Health and Fitness, Inc. ("Icon") and Sears, Roebuck and Company ("Sears"); (2) plaintiff Vectra Fitness, Inc.'s ("Vectra") motion for partial summary judgment as to defendants' invalidity defenses; (3) Vectra's motion for partial summary judgment on defendants' equitable defenses; and (4) Icon's motion for partial summary judgment as to Vectra's lost profits damages.

The court has previously set forth the general background of this matter in its orders addressing the parties' cross-motions for summary judgment on the issue of literal infringement. Additional background relevant to the present motions is set forth below in the pertinent section.

Having reviewed the pleadings filed in support and in opposition to these motions, the court finds and rules as follows:

## I. DISCUSSION

### A. Icon's Motion for Entry of Final Judgment

■ The court first addresses Icon's motion for entry of a Federal Rule of Civil Procedure 54(b) judgment, in which motion Icon asks the court to enter a final judgment denying its counterclaim of non-infringement and for a stay of proceedings so that it may appeal this court's claim construction.[1]

On March 22, 2002, Vectra filed this action alleging infringement of U.S. Patent No. Re. 34,572 (the "572 patent") by Icon,

---

1. Icon initially filed this motion before United States District Judge Marsha J. Pechman, to whom this case has been assigned for trial. On July 24, 2003, this court issued a minute entry reassigning the case to Judge Pechman and stating that this court will rule on the pending motions. While Icon's motion was not yet pending at the time the court reas-

as well as one of Icon's retailers, Sears. Icon counterclaimed for a declaratory judgment of non-infringement seeking a determination that "Icon's manufacture, sale, and use of its line of fitness equipment do not infringe any claim of the '572 patent." Answer and Counterclaim at ¶ 16.

On October 24, 2002, Vectra filed a motion for partial summary judgment of literal infringement of claims 25 and 26 of the '572 patent by two of Icon's products. In a February 14, 2003 Order, the court concluded that the WeiderPro 9930 infringed both claims 25 and 26 and that the WeiderPro 9940 infringed claim 26. Icon subsequently filed two additional motions for partial summary judgment of non-infringement, which Vectra opposed and cross-moved for summary judgment of literal infringement. In a July 3, 2003 Order, the court construed the remaining disputed claim terms and found that all of the Icon products at issue in those motions literally infringe the '572 patent. Still undecided are Icon's affirmative defenses of invalidity and estoppel as well as damages.[2]

Notwithstanding these remaining issues, Icon argues its declaratory judgment of non-infringement must be denied and a final judgment on that claim entered.

Federal Rule of Civil Procedure 54(b), which provides for appeal of a single adjudicated claim in a multi-claim case[3]:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

A judgment is not final for purposes of Rule 54(b) unless it is an "ultimate disposition of an individual claim entered in the course of a multiple claims action." *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435, 76 S.Ct. 895, 100 L.Ed. 1297 (1956); *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945) (stating that a district court's judgment is final where "it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment").

In view of the definition of a "final judgment," it is clear that such a judgment is inappropriate here. The court's prior orders have adjudicated only part of the claim for patent liability—literal infringement—and thus do not finally dispose of Vectra's infringement claim or Icon's counterclaim for non-infringement.

The cases on which Icon relies support this view. In each of these cases, the court granted a Rule 54(b) certification because it had granted summary judgment of *non-infringement to the defendants*. See *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1348 (Fed.Cir.2003) ("The district court ruled in the defendants' favor on the issue of infringement. The court

---

signed the case, this motion is nonetheless *properly considered by this court.*

2. These issues are addressed in this Order.

3. Rule 54(b) applies "only when additional claims, counterclaims, or thirdparty claims are left unadjudicated." *W.L. Gore & Assoc., Inc. v. Int'l Med. Prosthetics Research Assoc., Inc.*, 975 F.2d 858, 862 (Fed.Cir.1992).

Whether this action should even be considered a multiple-claims case is doubtful. Both Vectra's claims and Icon's counterclaims go to whether Icon's accused products infringe the '572 patent. Icon attempts to obscure this point by arguing that the issue of infringement and validity are separate claims. While these issues are, analytically, separate, both relate to the ultimate issue of infringement.

subsequently entered a final judgment under Rule 54(b)."); *Rheox, Inc. v. Entact, Inc.,* 276 F.3d 1319, 1324 (Fed.Cir.2002) ("[T]he court granted Entact's motion for summary judgment of non-infringement [and] entered final judgment pursuant to [Rule 54(b) ] on the issue of non-infringement, noting that outstanding counterclaims and third-party claims remained."); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.1997) (same). Thus, in all of these cases, the court determined that the plaintiff had failed to establish infringement, thereby disposing of the plaintiff's patent claim.

Here, in contrast, the court has determined that Icon's accused products literally infringe the '572 patent, and Vectra, to prevail in this case, must now prove that its patent is valid and enforceable. Icon has cited no case, and the court's research reveals none, in which a court has entered a final judgment under Rule 54(b) in a case with a similar posture. *Cf. Va. Panel Corp. v. Mac Panel Co.,* 887 F.Supp. 880 (W.D.Va.1995) (noting that, since the court had granted summary judgment of literal infringement, defendant's "patent misuse defense still could affect the patent infringement claim by making the patent unenforceable," and thus certification under Rule 54(b) was inappropriate). In sum, there has been no final determination of Vectra's infringement claim, or of Icon's counterclaim for non-infringement.

Accordingly, the motion for a final judgment and stay pending appeal is denied.[4]

## B. *Vectra's Motion for Summary Judgment as to Invalidity Defenses*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Genuine issues of material fact that preclude summary judgment are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a summary judgment motion, the court must view all facts and inferences therefrom in the light most favorable to the non-moving party. *See Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

### 1. *Invalidity*

In its Answer, Icon asserts affirmative defenses under 35 U.S.C. § 102 (non-anticipation), § 103 (non-obviousness), and § 112 (defective specification). In this motion, Vectra moves for partial summary judgment as to each of these invalidity defenses.

### a. *Anticipation and Defective Specification*

Icon has abandoned its defective specification defense. Opp'n at 4.

As to its § 102 defense, Icon admitted, in response to Vectra's Request for Admissions, that it does "not allege that any prior art renders any claim of the '572 patent invalid based on anticipation based on [§ 102]." Meiklejohn Decl., Ex. 2. Despite this prior admission, Icon now argues that it has identified a prior art device known as the AMF 9000, which, according to Icon, in light of the court's interpretation of various claim terms, "clearly contains all but one element of claim 26." Opp'n at 3. Icon states that the twenty-year-old brochure of the AMF 9000 is "un-

---

**4.** While the court agrees that Icon's motion is without basis, the court declines to award, as requested by Vectra, its fees associated with opposing the motion.

clear about the connection between the press arm and the floating pulley" but that "[i]f information clarifying that the connection is a cable can be identified prior to trial, Defendants will proceed with a defense of anticipation based on the AMF 9000 product." *Id.* at 3–4.

▮ Icon's assertion of its anticipation defense at this time is problematic for at least two reasons. First, Federal Rule of Civil Procedure 36(b) states that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Icon has never moved to withdraw its admission regarding its anticipation defense. Second, Icon states that it has yet to finalize this affirmative defense, despite the fact that discovery has been closed for some time, and trial is less than a month away. Icon, believing its defense is still timely, cites 35 U.S.C. § 282, which states that "the party asserting invalidity . . . shall give notice . . . to the adverse party at least thirty days before the trial . . . of any publication to be relied upon as to anticipation of the patent." While it is true that 35 U.S.C. § 282 sets forth this deadline for identifying prior art, it does not preclude the court from requiring the disclosure of prior art within the discovery deadline set by the court, well before the statutory limit.[5]

Accordingly, in light of Icon's earlier admission and its failure even to finalize this defense at this late date, Vectra is entitled to summary judgment on this affirmative defense.

b. *Obviousness*

▮ The court now turns to Icon's § 103 defense, which is based on obviousness. Section 103 makes patentability depend upon, in addition to novelty and utili-

ty, the nonobvious nature of the "subject matter sought to be patented." Obviousness is a question of law, but it must be decided on the underlying facts. *See Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471 (Fed.Cir.1986). The defendant has the burden of proving obviousness and must do so by clear and convincing evidence. *Robotic Vision Sys. Inc. v. View Eng'g,* 189 F.3d 1370, 1377 (Fed.Cir. 1999).

▮ A determination of whether the subject matter of claims in issue would have been obvious under 35 U.S.C. Section 103 involves factual findings with respect to: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) where relevant, objective evidence of nonobviousness, e.g., long-felt need, commercial success, failure of others, copying, unexpected results, i.e., the secondary considerations. *Graham v. John Deere Co.,* 383 U.S. 1, 13–14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

There is no dispute as to some of these factors. The relevant prior art includes U.S. Patent No. 676,771 ("Reach"), U.S. Patent No. 931,699 ("Medart"), U.S. Patent No. 4,634,127 ("Rockwell '127"), U.S. Patent No. 4,697,809 ("Rockwell '809") and the prior art devices identified as the AMF American Lifestyler 9000 ("AMF 9000") and the Eagle Lateral Raise ("Eagle"). Each of these is exercise machines with weight stacks connected by various cable and pulley configurations, as in the '572 patent. Also, the parties do not dispute that the level of skill in the art at the time the '572 patent was filed is an undergraduate degree in mechanical engineering together with several years of experience.

---

5. Moreover, inasmuch as it is less than 30 days before trial, Icon seems even to be out-

side the statutory limit.

*See* Barlow Decl., Ex. 12, McDonald Report, ¶ 22.

There is, for that matter, little disagreement about the differences between the '572 patent and the prior art. That is, Vectra does not dispute that there are similarities between the claims in the '572 patent and the prior art. For example, Icon compares claim 26 of the '572 patent with the AMF 9000 device, as well as with the Medart and Reach devices. According to Icon, "each of these devices differs only from claim 26 in that the they lack a third cable connected to an exercise device." Opp'n at 7. Icon has, in fact, submitted tables comparing the elements of claims 25 and 26 of the '572 patent with the prior art, revealing substantial similarities between the two.

For different reasons, however, Vectra argues that Icon cannot maintain an obviousness defense. Specifically, Vectra argues (1) that the prior art references on which Icon relies do not teach a suggestion or incentive to combine the references; (2) that any prima facie case of obviousness is rebutted by objective indicia of non-obviousness; and (3)that Icon, who relies on the same prior art that was before the Patent and Trademark Office (PTO) during a reexamination of the '572 patent, has not pointed to any examiner error. Each of these reasons, taken together and separately, are, in Vectra's view, sufficient to defeat Icon's obviousness defense.

i. *Suggestion or Incentive to Combine References*

■ When, as here, an obviousness determination is based on multiple prior art references, there must be a showing of some "teaching, suggestion, or reason" to combine the references. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed.Cir.1997) (also noting that the "absence of such a suggestion to combine is dispositive in an obviousness deter-

mination"); *Yamanouchi Pharm. Co. v. Danbury Pharm. Inc.*, 231 F.3d 1339, 1343 (Fed.Cir.2000) (affirming judgment as a matter of law rejecting infringer's obviousness contentions for lack of proven motivation to combine prior art references). The Federal Circuit recently reemphasized the importance of establishing the motivation to combine references:

> As this court has stated, "virtually all [inventions] are combinations of old elements." Therefore, an examiner [or accused infringer] may often find every element of a claimed invention in the prior art. If identification of each claimed element in the prior art were sufficient to negate patentability, very few patents would ever issue. Furthermore, rejecting patents solely by finding prior art corollaries for the claimed elements would permit an examiner [or accused infringer] to use the claimed invention itself as a blueprint for piecing together elements in the prior art to defeat the patentability of the claimed invention.
>
> To counter this potential weakness in the obviousness construct, the suggestion to combine requirement stands as a critical safeguard against hindsight analysis and rote application of the legal test for obviousness.

*In re Rouffet,* 149 F.3d 1350, 1357–58 (Fed. Cir.1998) (internal citations omitted). Icon cannot, therefore, simply "pick and choose among the individual elements of assorted prior art references to recreate the claimed invention." *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 887 (Fed.Cir.1988).

Icon fails to carry its burden of adducing "clear and convincing evidence" of obviousness. Icon argues, essentially, that claims 25 and 26 would have been obvious at the time of the invention based on various combinations of the prior art. It is far

from clear that "it would have been obvious" to combine the prior art references in the way that Icon asserts. Icon has pointed to no such teaching or suggestion in those prior art references to combine the references in a certain way.

Moreover, Icon's impermissible method of showing obviousness is underscored by the testimony of its expert, who revealed in his deposition that, in combining the prior art to show that all of the elements of claim 25 were met, he "look[ed] at the elements of Claim 25, look[ed] at the combinations, and then develop[ed] a combination that infringes Claim 25." Meiklejohn Decl., Ex. 1 at 182. Such an approach, which amounts only to impermissible hindsight reconstruction, cannot sustain an obviousness defense.[6] *See SmithKline*, 859 F.2d at 887 (stating that "[the defendant] has the burden to show some teaching or suggestion in the references to support their use in the particular claimed combination" and that "combination claims are [not] invalid based merely upon finding similar elements in separate prior art patents").

### ii. *Objective Indicia of Non-obviousness*

Of assistance in evaluating nonobviousness are the so-called subtests of invention. Objective evidence of nonobviousness—that is, how the patented product is viewed by the interested public—is highly probative on the obviousness issue:

> Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light

of the prior art was not. It is to be considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art. *Arkie Lures, Inc. v. Gene Larew Tackle Inc.*, 119 F.3d 953, 957 (Fed.Cir.1997). Such secondary considerations include the following: "long-felt need, commercial success, failure of others, copying, unexpected results ..." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291 (Fed.Cir.1985). "[A]n analysis of obviousness *must* address objective evidence of nonobviousness, if any." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed.Cir.1990).

In the patent's reexamination (discussed *infra*), the claims were rejected by the PTO examiner until Vectra presented its objective indicia of nonobviousness. After reviewing this evidence, the examiner allowed the claims to issue. Specifically, as to the claims at issue in this litigation, the examiner "found persuasive" that "competitors in the market place have copied the invention rather than using the prior art solutions" and that this objective evidence of nonobviousness "outweigh[s] the evidence supporting a *prima facie* case" of obviousness. Meiklejohn Decl., Ex. 4 at 1. The Examiner continued, "The evidence shows that [Vectra's] competitors expended great effort, over a substantial length of time, to design an acceptable multi-station, cable-ready exercise machine" but that "as shown by their subsequent copying of the invention despite the availability of alternative solutions, these competitors found the alternatives to be unacceptable when compared to the invention." *Id.* "Copying in an indicium of non-obviousness, and is

6. Icon cannot, furthermore, rely solely on Dr. McDonald's statements regarding the combinations of prior art to defeat this motion. *See Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.*, 853 F.2d 1557, 1564 (Fed.Cir.1988) ("[A]n expert's opinion on the legal conclusion of

obviousness is neither necessary nor controlling."). The court also notes that, in arriving at his conclusion of obviousness, Dr. McDonald did not attempt to combine the prior art without using the schematics, which are not in the prior art.

to be given proper weight." *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 679 (Fed.Cir.1988). This objective evidence of non-obviousness remains unrebutted by Icon.

### iii. *Presumption of Validity*

Finally, when a patent has been examined and duly granted, judicial review must give due weight to the presumption of validity. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid."). The presumption of validity is based on the presumption of administrative correctness of actions of the agency charged with examination of patentability. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985) (stating that the government agency is presumed to have done its job). Where, as here, the defendant bases his obviousness defense on the same prior art relied upon by the examiner, its "burden of proving invalidity [is] made heavier." *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985); *see also Centr. Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1577 (Fed. Cir.1983) (stating that the presumption of patent validity is "most formidable" in regard to prior art that was previously considered by the PTO).

Vectra's patent application was originally filed on September 16, 1987 and first issued as United States Patent No. 4,809,-972 (the '972 patent) on March 7, 1989. After the '972 patent issued, Vectra apparently became aware of prior art patents that had not been found during the prosecution of the '972 patent, and it subsequently cancelled eight of the original claims from the '972 patent. Vectra later filed to have the '972 patent reissued, seeking to add claims 28–31. The reissued '572 patent issued on March 29, 1994.

On February 6, 1997, a third party, Pacific Fitness Corp. ("Pacific"), filed a Request for Reexamination with the PTO. After the reexamination proceeding, the Federal Circuit invalidated claims 28—31 of the '572 patent. *See Vectra Fitness, Inc. v. TNWK Corp.,* 162 F.3d 1379, 1381 (Fed.Cir.1998). Thus, the '572 patent (including the claims at issue in this case) has been examined, in various forms, three times by the PTO.

Icon has not even alleged that the PTO examiner committed error when reviewing these precise prior art references. The patent examiner, an expert in the field, has already reviewed each of the references on which Icon now relies and concluded that there was no combination of references that renders any claim obvious.[7] For Icon simply to reargue the purported obviousness of these prior art references falls far short of its burden of establishing its defense by "clear and convincing evidence." *See Fromson v. Advance Offset Plate. Inc.,* 755 F.2d 1549, 1555 (Fed.Cir.1985) ("The Examiner's decision, on an original or reissue application, is ... evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence."); *cf. Interconnect Planning,* 774 F.2d at 1139 (vacating summary judgment of invalidity because the district court "relied on the identical references that had been before the reissue examiners, and ... reached a different conclusion of law").

---

7. Icon argues that "as a direct result of the broad interpretation" of claim terms adopted by this court, Opp'n at 12, the prior art previously before the examiner is now sufficient to render Vectra's claim obvious. The examiner, in the reexamination process, recognized that "the limitations expressed [during reex- amination proceedings] are read as broadly as their terms reasonably allow," Meiklejohn Decl., Ex. 2 at 2 (citing *In re Etter,* 756 F.2d 852 (Fed.Cir.1985)), and thus, the court's claim construction cannot be considered broader than the construction already adopted by the examiner.

In sum, because Icon has pointed to no suggestion or teaching in the prior art references to combine the references in the way that Icon alleges, because there is compelling objective evidence of nonobviousness, and because Icon has pointed to no error in the PTO's decision to reissue the '572 patent, the court finds that Vectra is entitled to summary judgment on Icon's § 103 invalidity defense.

C. *Vectra's Motion for Summary Judgment on the Icon's Equitable Defenses*

Icon has alleged that Vectra's infringement claims are barred by the affirmative defenses of laches and estoppel.

Each defense is based on the following facts. Between 1991 and 1994, Icon introduced a number of exercise products using various cable and pulley configurations to operate multiple exercise stations from a single weight stack. In September 1994, Vectra sent two different letters to Icon, which addressed two specific products of infringement of the '572 patent. Icon's counsel responded in September 1994 and again in November 1994 to indicate that he was investigating Vectra's allegations. Vectra did not receive a substantive response from Icon until February 21, 1995.

Over the next few months, the parties engaged in an extended letter-writing campaign, which initially centered on whether the accused product, the Lifestyler 300, infringed claim 25 of the '572 patent and whether claim 14 was infringed. When it became clear that the parties could not agree on the infringement issues, they began to discuss entering a licensing agreement to resolve the dispute. On January 26, 1996, Icon's counsel invited Vectra to submit a proposed license agreement, and the parties then discussed the details of the proposal. The parties could not reach agreement. The last correspondence is dated September 18, 1996, on which date Vectra wrote to Icon pointing out that Icon

had not provided any further information regarding the infringement issues.

Defendants Icon and Sears continued selling various multigym products between 1996 to the present, some of which products are accused of infringing the '572 patent. Vectra initiated this litigation on March 19, 2002. According to Vectra, it had "substantial reasons for not immediately pursuing a patent infringement suit against Icon in 1995": it was "actively enforcing its patent rights against a multitude of other infringers." Mot. at 7–8.

Icon has alleged that, in light of the delay between the initial infringement allegations and the filing of this action and the alleged prejudice resulting therefrom, Vectra's ability to recover for the alleged infringement should either be precluded altogether or limited.

1. *Estoppel*

 Estoppel applies if a patent owner represents to an infringer, expressly or implicitly, that he will not enforce his patent against the infringer's business, and the infringer relies on that representation. To establish the defense of equitable estoppel, Icon must show: (1) misleading conduct by Vectra which led Icon to reasonably infer that the Vectra had abandoned its claim; (2) reliance on that conduct; and (3) prejudice as a result of reliance. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992). If established, the defense of estoppel bars all recovery for infringement. *See Scholle Corp. v. Blackhawk Molding Co. Inc.*, 133 F.3d 1469, 1471 (Fed.Cir.1998).

a. *Misleading Conduct*

 To establish misleading conduct, Icon must do more than point to inaction or silence on Vectra's part. *See Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d

1290, 1294 (Fed.Cir.1992) ("[M]ere silence must be accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to bad faith."); *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1461 (Fed.Cir.1990) ("[M]ere verbal charge of infringement, if made, followed by silence [is] not sufficient affirmative conduct to induce a belief that the [patentee] had abandoned an infringement claim."). Instead, in cases of inaction there must have been a "clear duty to speak" or "known acquiescence" before silence will be considered conduct sufficient to call into play the estoppel defense. *Aukerman*, 960 F.2d at 1028. "Some evidence must exist to show that the silence was sufficiently misleading to amount to bad faith ... It must be sufficiently misleading to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims ...." *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed.Cir.1987).

Here, Icon, to establish misleading conduct, points primarily to Vectra's "strenuous and repeated threats and allegations of infringement, followed by the extended licensing negotiations ... and then extended silence."[8] Opp'n at 6.

The record reveals only that Vectra initially communicated with Icon, stating its position that some of Icon's products infringe the '572 patent, and then engaged in licensing negotiations. Vectra's willingness to engage in licensing negotiations with Icon cannot be the basis of misleading conduct. *See Meyers v. Asics Corp.*, 974 F.2d 1304, 1307–09 (Fed.Cir.1992) ("[W]e

do not believe that a suggestion of infringement coupled with an offer to license followed by silence would suffice to establish equitable estoppel."). There is no record of "affirmative conduct that estoppel requires, includ[ing] misrepresentations, affirmative acts of misconduct, or intentionally misleading silence" by Vectra. *Adelberg Lab., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1273 (Fed.Cir.1990). In other words, this is a classic example of where "there was no action by plaintiff that would lead a reasonable competitor to assume that continued infringement by defendant was condoned or approved by plaintiff."[9] *Hemstreet*, 972 F.2d at 1295.

b. *Reliance*

 However Icon characterizes Vectra's conduct, it cannot show that it relied on any such conduct. "The accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action." *Aukerman*, 960 F.2d at 1042. "To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead." *Id.* at 1043.

Here, Icon relies on *post hoc* conclusory statements that it relied on Vectra's conduct rather than on any contemporaneous evidence demonstrating such reliance. In fact, the record shows that Icon, relying on the opinion of its counsel, believed that its products did not infringe Vectra's patent, and thus decided to press on with its sales.

---

8. On this point, Icon cites to the declaration of Neil Smith, an intellectual property attorney, whom Icon retained as an expert on its affirmative defenses. On July 24, 2003, the court granted Vectra's motion to strike Mr. Smith's expert report, as unnecessary, and thus the court disregards Mr. Smith's conclusions regarding the estoppel defense.

9. The court notes, moreover, that the cessation of licensing negotiations in September 1996 was the result of Icon's failure to respond and follow through on the outstanding licensing issues. Thus, it cannot be said that Vectra's failure to continue negotiations with Icon evidences its abandonment of its patent claim. The record shows that Icon, not Vectra, ceased negotiations.

*See* Meiklejohn Decl., Ex. 5 (Dalebout Dep. 228:10–17) (stating that Icon, relying on its counsel's advice, believed that its products did not infringe Vectra's patent). Most courts have held that an accused infringer cannot be said to have relied on the patent owner's delay when it acted in the belief that the patent was not infringed. *See, e.g., Armstrong v. Motorola, Inc.*, 374 F.2d 764 (7th Cir.1967) ("Motorola did not rely upon any inaction of [plaintiff] but instead decided ... that it was not infringing his patents and therefore would not take a license."); *Nursery Supplies Inc. v. Lerio Corp.*, 45 U.S.P.Q.2d 1332, 1342 (M.D.Pa.1997) (stating that the infringer "believed the patent [was] invalid, as supported by its response letter ... to the charge of infringement on that patent [and] therefore made a business decision to proceed with its own [product]."). *But see ABB Robotics Inc. v. GMFanuc Robotics Corp.*, 828 F.Supp. 1386, 1399 n. 27 (E.D.Wis.1993) ("To hold that a defendant who believes his device does not infringe, but who also relied upon the inaction of the patentee may not assert the defense of estoppel, is contrary to the principles of equity.").

Icon also states, that "[h]ad Vectra pressed its claims of infringement against Icon in 1996 Icon would simply have avoided the designs ... Vectra now claims fall within the scope of the '572 patent and instead sold products which Vectra concedes do not infringe." Opp'n at 9. This statement is not evidence of reliance. To the contrary, it is clear that Icon's development operations continued without any interruption from, or reliance on, Vectra's conduct:

Q. Once those discussions [with Vectra] ceased, ultimately who made the decision at Icon to proceed with its line of multi-station weight machines with a cable-pulley system?

A. [William Dalebout, Icon's Vice President of Design] I don't think there was a decision to proceed. I think that we were in the midst of doing business, and we never stopped doing that business. We had a patent holder contact us through their attorneys and allege certain things which we did not agree with. We are not in the business of stopping business when someone asserts a claim. Heavens, we'd never get anything done in this world. All they would have to do is cry wolf and we'd come to a stop.

Park Decl., Ex. 18 at 231:23—232:18 (Dalebout Dep.).

There is no genuine issue of material fact on this issue. The record clearly evidences that Icon was not "lulled into a sense of security" nor that it relied on any conduct of Vectra's in deciding to continue manufacturing and selling the allegedly infringing products. Thus, summary judgment is appropriate on Icon's estoppel defense.

### 2. *Laches*

 Laches arises when the patent owner unreasonably and inexcusably delays filing suit for infringement to the material prejudice of the infringer. *See Aukerman*, 960 F.2d at 1032. When the infringer proves laches, the patent owner may not recover damages for infringements occurring prior to the filing of suit. *See Adelberg Lab., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed.Cir.1990) ("Laches applies until the date of suit."). Estoppel and laches are closely related, but, in terms of the required showing, there are differences: laches requires only unreasonable, inexcusable delay and prejudice, whereas estoppel requires the additional element of affirmative conduct by the patentee which induces the infringer into believing that the claim is abandoned. *See Gasser Chair Co., Inc. v. Infanti Chair Manuf. Corp.*, 60 F.3d 770, 776 (Fed.Cir.

1995) (setting froth with the distinction between the two defenses).

 A six-year delay is presumed unreasonable, and, when such a delay exists, the burden shifts to the patentee to provide an adequate excuse for the delay. *Aukerman,* 960 F.2d at 1032. The delay is measured from the time when the patent owner knew, or, in the exercise of due diligence, should have known of the defendant's allegedly infringing activity. *Id.* at 1328. It is undisputed that Vectra knew of Icon's allegedly infringing activity in September 1994 and that this action was filed in March 2002. Therefore, the delay between Vectra's knowledge of Icon's activities and the time at which it filed suit is approximately 7.5 years, thus giving rise to a rebuttable presumption of unreasonable delay.[10]

Vectra contends that much of this delay is excusable. The *Aukerman* court noted that delay has been excused by, *inter alia,* other litigation and negotiations with the accused. *Id.* at 1033. That the period between September 1994 (when discussions with Icon began) and September 1996 (when licensing negotiations ceased) are excused for laches purposes seems straightforward. *See, e.g., Giese v. Pierce Chem. Co.,* 29 F.Supp.2d 33, 40 (D.Mass. 1998) (citing *Aukerman* and stating that "plaintiff's continuous and bilaterally progressing efforts to resolve the patent dispute justify delay in bringing suit").

The court next turns to the question of whether Vectra's engagement in other litigation constitutes excusable delay. Some courts have required that the patentee give notice to the infringer of the other

litigation. *See Jensen v. Irrigation & Mfg., Inc.,* 650 F.2d 165, 168 (9th Cir.1980) ("In the absence of notice to the alleged infringers that he was delaying enforcement of his patent until conclusion of the Ireco litigation, Jensen may not rely on that litigation as an excuse for his delay."); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548 (Fed.Cir.1996) (same). In this case, Vectra informed defendant Sears by letter on October 6, 1995 that Vectra "had already filed an infringement action against another infringer." Meiklejohn Decl., Ex. 2. The Pacific Fitness litigation, in which the scope of the claims was changed and the reexamination filed, began in December 1996 and ended in May 2001. There is no genuine dispute that Icon was aware of Vectra's engagement in these other litigations during this period.

Vectra has, therefore, "eliminated [the presumption of laches] by offering evidence to show an excuse for the delay ... even if such evidence may ultimately be rejected as not persuasive." *Aukerman,* 960 F.2d at 1038. Whether those excuses prove persuasive and whether Icon can prove prejudice (either economic or evidentiary) are issues that remain for trial. "Elimination of the presumption does not mean the patentee precludes the possibility of a laches defense; it does mean, however, that the presumption of laches plays no role in the ultimate decision. The facts of unreasonable delay and prejudice then must be proved and judged on the totality of the evidence presented." *Id.* at 1039. The burden of production and persuasion on this affirmative defense remains with Icon.

---

**10.** Icon believes that Vectra's delay may be even greater, stating that "given the notorious and open activities of Icon beginning in 1991, and Vectra's admission that it was active in the market during that time, Vectra should have known of Icon's allegedly infringing activities substantially earlier than 1994."

Opp'n at 13. According to Vectra, the parties' first contact consisted of Vectra's sending copies of its recently issued patent to several industry participants, and thus "[t]here is no evidence to support infringement prior to September 1994."

In finding that this issue is inappropriately resolved here, the court notes the unusual posture of this issue. In most cases, the defendant moves for summary judgment on its laches defense, and, if there is a six-year delay, the burden shifts to the patentee to "burst the bubble" of the presumption of laches to survive summary judgment. Here, however, Vectra, in its opening memorandum, conclusorily argued only that "[t]here is simply no evidence that Vectra delayed filing suit to Icon's detriment." Mot. at 12. Faced only with this perfunctory argument, Icon, to survive summary judgment, needed only to show why its defense should be presumed valid. While Vectra, in reply, proffered sufficient evidence to puncture the "bubble" of the presumption, the ultimate question of whether Icon can sustain its burden on this defense remains for trial.

### D. *Icon's Motion for Summary Judgment as to Lost Profits*

In this motion, Icon seeks dismissal of Vectra's lost profits claim, arguing that Vectra cannot proffer sufficient evidence that "but for" Icon's sales of allegedly infringing products, it would have made those sales.

■■■ The patent statute provides that a patent owner who proves infringement is entitled to damages no less than a reasonable royalty:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

35 U.S.C. § 284. However, the patent owner may recover its lost profits, rather than a reasonable royalty, if the patent owner can prove that "but for" the infringement he would have made the sales that the infringer made. *Grain Processing Corp. v. Am. Maize–Products Co.*, 185 F.3d 1341, 1348 (Fed.Cir.1999). The patent owner need only make this demonstration by a preponderance of the evidence— i.e., by proving that it is more likely than not that the patent owner suffered lost profits. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed.Cir.1991).

Icon's manufacturing and sales of its allegedly infringing products, Vectra asserts, precluded it from entering the low-price market of home gyms, and it suffered lost profits as a result. According to Vectra, its growth strategy, beginning in the late 1980s, was, first, to enter the high-end market for home gyms and, then, "after Vectra's reputation/recognition as a premiere manufacturer of home gyms had been cultivated[,] to diversify the product offering to lower price markets, including mass merchants, in order to capitalize on the good will and reputation Vectra had developed." Opp'n at 3. Vectra maintains that, during the period of Icon's alleged infringement, it possessed the marketing capacity and ability to internally finance its operations, and also the manufacturing capacity to capitalize on the lower-price market. Vectra contends that it was precluded from pursuing the lower price market because, by 1998, Icon had saturated the market with products that used Vectra's patented technology.

Vectra has identified some 42 different Icon multi-gym products that allegedly infringe at least one claim of the '572 patent, and Icon has sold over 35 other multi-gyms that are unaccused. Based on the records presently available, the sale of these products from 1996 to the present total approximately $140 million. From 1996 to the present, according to Icon, the non-accused products have totaled some $123 million in sales.

### 1. *"Panduit" Standard*

The so-called "Panduit" standard is the most widely accepted way that courts determine causation on lost profit claims. *See Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978). Under *Panduit*, the element of causation has been broken down into the following four constituent elements: (1) demand for the patented product in the market; (2) the plaintiff's ability to meet this demand; (3) the absence of acceptable non-infringing substitutes; and (4) the amount of profit the patentee would have made. *Id.* at 1156. While the Federal Circuit has adopted the *Panduit* test, and has frequently applied it in examining lost profits claims, the court has also indicated that the *Panduit* test is not necessarily the exclusive one on the subject of lost profits. *See, e.g., Bio–Rad Laboratories*, 739 F.2d at 616.

In arguing that Vectra cannot establish "but for" causation, Icon focuses primarily on two of the *Panduit* factors: whether Vectra can show the absence of acceptable non-infringing substitutes and whether Vectra had the manufacturing and marketing capabilities to exploit the demand.[11]

#### a. *Acceptable Non-infringing Substitutes*

▉▉▉▉▉ To prove that there are no acceptable non-infringing substitutes, the patent owner must show either that (1) the purchasers in the marketplace generally were willing to buy the patented product for its advantages, or (2) the specific purchasers of the infringing product purchased on that basis. *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed.Cir.1991).

Arguing that there were acceptable non-infringing substitutes for the patented product, Icon focuses on the sales of its non-infringing products, which are similar to its allegedly infringing products. *See* Mot. at 8 –9 (comparing WeiderPro 9940, an accused product, with the WeiderPro 9400, both of which are two-stack systems with six or seven exercise stations). Icon concludes that "[h]ad Icon not sold the products now accused of infringement during the time of 1996 to the present, Icon would have merely sold corresponding Icon Non-infringing Products." Mot. at 12.

In response, Vectra, relying on the declarations of Lee Rawls, an expert in the fitness machine industry, and Arthur Buell Ish III, one of the inventors of the patent, argue that the non-infringing devices cited by Icon are not acceptable substitutes for the patented products. Vectra compares the attributes of Icon's infringing products (which allegedly use the patented advantages) and the non-infringing products, arguing that the latter are, for a number of reasons cited, "products vastly less desirable from the standpoints of customer preference, practicality, and marketplace viability." Opp'n at 6. Icon, for its part, deems many of Vectra's comparisons of little value because, Icon states, Vectra relies on claimed attributes—such as having a better-functioning exercise station or allowing for better storage—that are not patented elements.

Drawing all reasonable inferences in Vectra's favor, the court finds that this issue should be resolved by the trier of fact. For purposes of this motion, the court assumes that, if customers in the

---

11. Icon implicitly concedes that demand for Vectra's patented technology exists because Icon's sales are evidence of demand. *See Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed.Cir.1984) ("The substantial number of sales ... of infringing products containing the patented features itself is compelling evidence of the demand for the product.").

market for a home multi-gym believed that the non-infringing products were acceptable substitutes for the infringing products, they would have purchased the former instead of the latter. *See Standard Havens*, 953 F.2d at 1373 (stating that "a reasonable juror could have found that the sales made by [the infringer of its product] were made because of [the patented] advantages and that there were 'no acceptable substitutes other than the patented device' "). Icon's motion assumes that, even without the infringing products, it would have maintained its market share by selling its non-infringing products to the thousands of customers to whom it sold infringing products. For present purposes, the court assumes the contrary— that the customers chose to purchase the infringing products, at least in part, because of the patented technology. It is, therefore, within the province of the jury to determine whether Icon's non-infringing products constitute acceptable non-infringing substitutes.

### 2. *Capability to Meet Demand*

■ The next *Panduit* element, the patent owner's manufacturing and marketing capacity, simply means that to be entitled to lost profits, the patent owner had to have the physical ability to make the lost sales. The Federal Circuit has been fairly liberal in upholding determinations of manufacturing and marketing capacity. In *Fonar v. General Electric Co.*, 107 F.3d 1543, 1553 (Fed.Cir.1997), the court noted that "[t]here was ... substantial evidence that [the patentee] had the capacity to manufacture machines whose sales it lost." In so concluding, the court relied on the patentee's expert testimony that the patentee had the machinery, sufficient employees, and a "fast growth rate" to show that it could have increased its production. *Id.; see also Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 825 (Fed.Cir.1989); *Gy-*

*romat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549 (Fed.Cir.1984).

Icon argues both that Vectra cannot show that it had the manufacturing and marketing capacity to meet the demand and that there is no evidence that Icon's presence in the market precluded Vectra's entering that market. For its part, Vectra, relying on the McLean and Mandell declarations, asserts that it planned to enter the lower-price market in which Icon sold its products and that it had the capacity to make, market and sell products comparable to the products sold by Icon. *See* Opp'n at 4 (accounting for its manufacturing capacity). Icon vigorously contends that, whatever Vectra's manufacturing capacity, the relatively low volume of Icon's sales in the relevant period could not, practically, have precluded Vectra from entering that market.

The record before the court is simply insufficient for Icon's argument to be given dispositive weight. Whether Vectra had the capacity to manufacture and market products comparable to Icon's is a question of fact incapable of resolution here. Indeed, the Federal Circuit has held that when a patentee claims that the infringer's actions prevented entry into the market, whether the patentee would have entered the market is a question of fact. *See Hebert v. Lisle Corp.*, 99 F.3d 1109 (Fed.Cir.1996). In *Hebert*, the defendant argued that the patentee was not entitled to lost profits because the patentee never sold a product embodying the patented technology. *Id.* at 1119. The patentee argued, as does Vectra, that the defendant's action in flooding the market with the infringing tool "denied him the opportunity to proceed to enter [the] market, thus depriving him of the profits he would have made." *Id.* The Federal Circuit held that "[w]hether [the patentee] can meet the burden of showing that he would have

manufactured the device, and earned the asserted profits, requires the attention of the trier of fact." *Id.*

### 3. *Amount of Damages*

▮ The issue of causation does not end the test for lost profits—the patent owner must still prove the amount of lost profits. *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1377 (Fed.Cir. 2002) ("[T]he patent owner bears the burden of proving by a preponderance of the evidence the quantum of damages, an issue of fact for which we review the jury's decision for substantial evidence."). The patent owner need only provide a "reasonable approximation" of the amount of lost profits caused by the infringement. *Saginaw Prods. Corp. v. Eastern Air. Inc.*, 615 F.2d 1136, 1142 (6th Cir.1980). And "when the amount of the damages is not ascertainable with precision, reasonable doubt is appropriately resolved against the infringer." *Del Mar Avionics, Inc. v. Quinton Instr. Co.*, 836 F.2d 1320, 1327 (Fed.Cir.1987).

▮ The parties here dispute the amount of lost profits to which Vectra would be entitled. Vectra's expert opines that Vectra lost $25,830,000 in profits due to Icon's alleged infringement. *See* Park Decl., Ex. 2 at 3 (Supplemental Expert Report of Mandell). Icon disputes Vectra's computation of its lost profits. The amount of Vectra's lost profits, if any, is an issue of fact for the jury.

### II. *CONCLUSION*

For the foregoing reasons, Icon's motion for a final judgment under Rule 54(b) [doc. no. 156] is DENIED; Vectra's motion for summary judgment on Icon's invalidity defenses [doc. no. 127] is GRANTED; Vectra's motion for summary judgment on Icon's equitable defenses [doc. no. 129] is GRANTED IN PART and DENIED IN PART; and Icon's motion for summary

judgment as to lost profits [doc. no. 135] is DENIED.